**Arthur Jackson BURTON, Plaintiff,**

v.

**Dale FOLTZ, Defendant.**

**Civ. No. 83–CV–1647–DT.**

United States District Court,
E.D. Michigan, S.D.

Nov. 9, 1984.

Glenn Brown of the firm of Kohl, Secrest, Wardle, Lynch, Clark & Hampton, Farmington Hills, Mich., for plaintiff.

Eric Eggan, Asst. Atty. Gen., Lansing, Mich., for defendant.

## MEMORANDUM AND ORDER

COHN, District Judge.

This is a prisoner civil rights case, 42 U.S.C. § 1983, challenging the constitution-

ality of administrative regulations of the Michigan Department of Corrections (department) which allows department personnel to inspect mail from residents in administrative segregation (segregation) sent to media representatives. (The relevant regulations are reprinted in *Appendix A.*) Plaintiff initially sought injunctive and monetary relief. The Court found plaintiff was not entitled to money damages on April 6, 1984 and directed defendant, warden at the State Prison of Southern Michigan, a department facility, to explain why the media mail of residents in segregation should be inspected when the media mail of residents in the general population was not inspected. Defendant filed a supplemental affidavit on April 27, 1984 explaining the reasons and plaintiff now moves for summary judgment. For the reasons that follow, plaintiff's motion is GRANTED.

## I.

Plaintiff, while in segregation, sent a sealed letter to an investigative reporter for a Detroit newspaper. The letter was returned with a note stating that outgoing mail was required to be unsealed with certain exceptions not including mail sent to the media. Plaintiff contends this restriction, as applied to media mail, impermissibly infringes on his right to free speech protected under the First Amendment of the United States Constitution.

Department regulations, as reflected in *Appendix A*, limit confidential communications from a resident in segregation to mail sent to courts, designated attorneys, public officials, and specified personnel of the department. In contrast, residents in the general population are specifically allowed to send uncensored correspondence to media representatives. Residents may be placed in segregation for a limited number of reasons; they have either demonstrated an inability to be managed with group privileges, need protection, are a threat to the physical safety of others or present a serious threat of escape.[1] Defendant says the regulation requiring most mail from resi-

dents in segregation, including media mail, to be unsealed is necessary for three reasons: 1) to check for contraband; 2) to prevent the making of escape plans or plans to cause physical injury to a staff member, a resident, or a member of the general public; and, 3) to check for depressive or suicidal tendencies.

## II.

■ The court recognizes that department officials should be accorded substantial deference over matters that in

"their judgment are needed to preserve internal order and discipline and to maintain institutional security. 'Such considerations are peculiarly within the province and professional expertise of correctional officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' "

*Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 827, 94 S.Ct. 2800, 2804, 2806, 41 L.Ed.2d 495 (1974)). However, it is also clear that a prisoner is not stripped of all constitutional protection by his or her status, and retains those rights that are "not inconsistent with his status as a prisoner or with the legitimate penalogical objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). The court, therefore, has the obligation to determine the proper accommodation between institutional needs and plaintiff's constitutional rights. *Bell,* 441 U.S. at 546, 99 S.Ct. at 1877.

## III.

■ Here the court must find a balance between the needs of the department to maintain institutional security and internal order with the right of inmates and the press to exercise free speech. Not only do

---

1. See Administrative Regulation R 791.4405 *Appendix A.*

inmates have a First Amendment right to uncensored communication by letter, *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the media has "a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15, 98 S.Ct. 2588, 2597, 57 L.Ed.2d 553 (1978). The inspection of mail from residents to the media infringes on both the rights of residents and the press because it raises the possibility of censorship. See *Martinez*, 416 U.S. at 408, 94 S.Ct. at 1808–09.

In *Martinez* the Supreme Court described the standard by which regulations limiting the use of the mail under the circumstances here described should be judged:

> "[Prison officials] must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved."

416 U.S. at 397, 94 S.Ct. at 1803. The regulations in this case provide for "inspection" rather than censorship. Functionally, however, it is not possible to separate the two. Unless department personnel intend to stop certain kinds of communications from going out, inspection would hardly be necessary.

### A.

Defendant, as mentioned, offers three justifications for requiring mail sent to the media to be unsealed. The first proffered reason, to check for contraband, simply does not wash. Contraband is certainly a serious problem in a correctional setting, but the main problem is to keep it from *entering*, rather than leaving, the correctional facility. See *Martinez*, 416 U.S. at 424, 94 S.Ct. at 1816. (Justice Marshall, concurring). Defendant offers no support for the proposition that residents in segregation, given the variety of reasons for their being there, are more likely to run

drug rings offering their services to members of the media than residents in the general population. Media representatives, should they desire drugs for some reason, would hardly look to residents in segregation as a source.

Defendant's second justification, to check for escape plans or plans to harm someone, also bears no rational relationship to media mail. While certain residents in segregation present threats of escape or physical harm to others, this is not true of all residents in segregation. Also, it is highly unlikely members of the media would aid residents in segregation in an escape plan or in a plan to injure or kill some individual. This justification simply does not warrant the inspection of media mail of all residents in segregation. Defendant's third justification, to check for suicidal tendencies, is the only one possibly furthered by inspecting media mail. However, the regulation is broader than necessary to further this rehabilitative interest. Department regulations allow communications to courts, designated attorneys and certain department officials to be sealed. Including mail to the media in this listing would have little, if any, effect on legitimate institutional needs. It will, however, protect the substantial First Amendment rights of residents in segregation to send, and the media to receive, letters criticizing conditions of confinement. See *Houchins, supra.*

### B.

The reasoning in *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir.1978), is persuasive. There the Fifth Circuit affirmed a district judge's decision that persons in custody and the media have a constitutional right to have mail to members of the media sent unopened. The Fifth Circuit said:

> "An informed public depends upon accurate effective reporting by news media. In refusing to block inmates' press correspondence and in protecting it from censorship we protect not only the interests of the inmates, but of the public at large..."

*Id.* at 759. As the Fifth Circuit noted in *Guajardo,* the Supreme Court decision in *Pell v. Procunier, supra,* supports this holding. In *Pell* the Supreme Court held that media representatives who had the opportunity to receive and send mail to persons in custody virtually without interference could be constitutionally barred from conducting unhindered personal interviews with them. Institutional regulations in *Pell* allowed mail to the media to be sent without inspection, and mail from the media was only checked for contraband. Since the media enjoyed these broad rights, the Supreme Court found the restrictions on personal interviews to be reasonable. *See* 417 U.S. at 823–824, 94 S.Ct. at 2804–05. The logical implication of the decision is that unrestricted media correspondence is important to protect the First Amendment rights of residents and the media.

Defendant's concern for internal security and order is hardly hindered by adding media mail to the categories of mail from residents in segregation allowed to be sent without inspection. See R791.6605, *Appendix A.* If department personnel fear residents will designate mail as media mail as a subterfuge to send out escape plans or other communications injurious to the security and order of the institution, such letters can be held long enough to verify that the addressee is indeed a member of the media. *Guajardo, supra,* at 759. Furthermore, if department personnel suspect some member of the media is aiding a resident in some illegal plan, they may hold the letter and obtain a search warrant. *Id.*

Apart from these minor restrictions letters from residents to the media cannot be constitutionally inspected. Totally unhindered communication between residents and the media protects important interests of the resident, the press and the general public. The primary reason residents communicate with the press is to criticize institutional conditions. Residents in segregation, with its severe restrictions, are even more likely to criticize the conditions in which they are confined than residents in the general population. Allowing inspection of media mail will chill open communication by these residents with the media, since it allows critics to be identified, creating fear of reprisals. *Martinez,* 416 U.S. at 424, 94 S.Ct. at 1816. (Justice Marshall, concurring). Furthermore, uninhibited correspondence between residents and the media helps keep the debate over institutional conditions in the public arena where it belongs. See *Guajardo, supra,* at 759.

### III.

Accordingly, plaintiff's motion for summary judgment is GRANTED. The parties shall submit an appropriate order within ten (10) days.

### APPENDIX A

*R 791.6603. Mail rights; writing materials and postage; incoming mail; inspection; limitations; legal correspondence; notice of rejection; violation of rules; hearing.*

Rule 603. (1) A resident in general population status shall be permitted to send uncensored letters to any person or organization, subject to the limitations of subrules (5) to (8). Mail of a resident in segregation status shall be subject to inspection, except for correspondence to persons enumerated in R 791.6615(2).

(5) The following shall be considered violations of the department's mail rules:

(a) Correspondence which contravenes federal or state law.

(b) Correspondence which violates postal regulations.

(c) Correspondence containing contraband.

(d) Correspondence containing a criminal plan or conspiracy.

(e) Threatening correspondence.

(f) Correspondence addressed to any party who expressly objects to receiving mail from a resident, if sent after the resident has been notified of the objection.

(6) The department may intercept, open, inspect, and refuse to transmit mail when there are reasonable grounds to believe the

mail is being sent contrary to department mail rules. This provision shall not apply to clearly identified correspondence to courts, attorneys of record, public officials, the corrections ombudsman, and members of the department's central office staff.

(7) Whenever the department does not transmit first class mail, it shall notify the sender of the rejection, including the reasons therefor.

(8) A resident charged with violating department mail rules shall be afforded an appropriate hearing, pursuant to procedures established in R 791.3305, R 791.-3310, and R 791–3315, before any disciplinary action is taken.

*R 791.6605. Access to the media, publishers, and interviews; suspension of right during emergencies.*

Rule 605. (1) General population residents shall be allowed uncensored correspondence with, and telephone access to, media representatives, subject to reasonable regulation as to time and frequency.

*R 791.6615. Access to courts; confidential communications.*

Rule 615. (1) Residents shall have reasonable access to the courts for the resolution of legal grievances, including, but not limited to:

(a) Challenges to the legality of conviction or confinement.

(b) Suits for redress or allegedly illegal conditions of confinement or treatment while incarcerated or under correctional control.

(c) Suits in connection with civil legal problems.

(d) Asserting any other constitutional or statutory rights against a governmental authority.

(2) A communication between a resident and the following persons or agencies shall be confidential:

(a) Designated attorneys.

(b) Courts.

(c) Public officials.

(d) The director of the department of corrections.

(e) The corrections commission.

(f) The corrections ombudsman.

(3) A legal document filed in court by a resident shall not be included in the resident's case history files at any level.

(4) A resident shall not be punished in any way for exercising the right of access to the courts.

*R 791.4405. Administrative segregation status; criteria for imposition; hearing; status review; monthly report; privileges; showers; daily inspection.*

Rule 405. (1) Administrative segregation may be imposed only when:

(a) A resident demonstrates inability to be managed with group privileges.

(b) A resident needs protection from other prisoners.

(c) A resident is a serious threat to the physical safety of staff or other residents or to the good order of the facility.

(d) A resident is a serious escape threat.